**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLYX FOSTER, ) | No.: 2:21-cv-00958-RJC |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Judge Robert J. Colville |
| ) | |
| ZACHARY WATSON and Z. WATSON ) | |
| ENTERPRISES, LLC d/b/a Genesis Body ) | |
| Arts and Z. Watson Piercing, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is Plaintiff, Allyx Foster's, Motion for Summary Judgment (ECF No. 45). The Motion has been fully briefed and is ripe for disposition.

## I. Factual Background & Procedural History

This action arises out of a Settlement Agreement entered into by the parties in the matter of *Zachary Watson and Z. Watson Enterprises LLC d/b/a Genisys Body Arts and Z. Watson Piercing v. Allyx Foster*, 2:20-cv-00977-RJC ("Underlying Lawsuit"). Mot. 1, n.1; Br. in Opp. 1. In the Underlying Lawsuit, Defendants (then Plaintiffs), a business offering piercing, body art, and body modification services sued Plaintiff (then Defendant), a prior apprentice, for defamation, intrusion upon seclusion, intentional infliction of emotional distress, invasion of privacy, injurious falsehood, and tortious interference with business relations stemming from a series of public social media posts, alleged to have been untrue. *See* Compl., 20-cv-00977, ECF No. 1. The social media posts at issue in the Underlying Lawsuit concerned posts from June 19, 2020 and June 20, 2020 in which Plaintiff (then Defendant) alleged that Defendant (then

1

Plaintiff), Zachary Watson, sexually harassed and assaulted her.  *Id.*; Br. in Opp. 1.  On July 14, 2021, Defendants (then Plaintiffs) filed a Stipulation of Dismissal in the Underlying Lawsuit (20-cv-00977, ECF No. 49) which was granted by the Court on July 15, 2021 (20-cv-0997, ECF No. 50).

On July 21, 2021, Plaintiff filed her Complaint (ECF No. 1) in the instant action alleging that Defendants had violated the Settlement Agreement in the Underlying Action, specifically as to the confidentiality clause and non-disparagement clause contained therein.  On June 8, 2024, Defendants filed their Answer with Counterclaims.  ECF No. 25.  In their Counterclaims, Defendants allege that Plaintiff breached the Settlement Agreement by (1) failing to provide a handwritten retraction and apology letter pursuant to Section 1(B) of the Settlement Agreement; (2) removing her retraction and apology from Facebook; (3) and making statements to a group called "the Piercing Babes" that she only signed the Settlement Agreement because she did not have enough money to fight the Underlying Lawsuit.

On July 14, 2023, Plaintiff filed her Motion for Summary Judgment (ECF No. 45), along with her Brief in Support and Exhibits (ECF No. 46).  On August 26, 2023, Defendants filed their Brief in Opposition (ECF No. 47), along with their Response in Opposition (ECF No. 48) and Exhibits (ECF Nos. 49-52).  On September 13, 2023, Plaintiff filed her Reply.  ECF No. 53.

The Settlement Agreement at issue was entered into by the parties on May 14, 2021.  Set. Agreement. (Br. in Supp., Ex. A; Def. Ex. 2, part 1, ECF No. 50).  As part of the Settlement Agreement, Plaintiff (then Defendant) agreed "to post a formal retraction and apology on Facebook and all other social media platforms on which her June 19, 2020 and June 20, 2020 posts . . . were shared."  *Id.* at 1.  The parties agreed on the language for the apology and retraction as part of the Settlement Agreement.  *Id.* at Ex. A.  Plaintiff was to post the retraction

and apology on her personal Facebook account within three days of her executing the Settlement Agreement, so that it could be shared on Defendants' account, on her story, and as comments to the original June 19, 2020 and June 20, 2020 posts.  *Id.* at 1.  Plaintiff additionally agreed to delete all other social media posts concerning Defendants.  *Id.*  Prior to the execution of the Settlement Agreement, Plaintiff was required to provide a handwritten letter of retraction and apology to Defendants.  *Id.* at 1.  Plaintiff was additionally required to send signed letters to the American Association of Piercers (AAP), Anatometal, and Industrial Strength informing them of the retraction, and carbon copy Defendants on the correspondence, prior to the execution of the Settlement Agreement.  *Id.* at 2.  The parties agreed on the language of the letters to be sent.  *Id.*

The Settlement Agreement contained a Confidentiality of Information clause which provided that:

A.   The Parties agree they shall not disclose, reveal, disseminate[,] or discuss, directly or indirectly any knowledge or information they may have regarding each other, including but not limited to knowledge of any of the events that gave rise to this cause of action, and that they shall keep all information they have related to each other in strictest confidence.  The Parties acknowledge that their agreement to keep this information strictly confidential and not to disclose the same is a material term of this agreement and that they would not be agreeing to this resolution without this undertaking.  The Parties' obligation to keep this information confidential shall survive the consummation of this agreement and shall remain in effect indefinitely.

B.   Except as otherwise specifically provided elsewhere in this release, the Parties and their counsel agree and covenant that they shall not disclose, reveal, publish, disseminate, or discuss, directly or indirectly, to or with any other person or entity the terms of this Agreement (including whether or not any amount was paid, the amount paid, or opinion(s) or information they may have with response to this Agreement).  The Parties may disclose that "there has been a retraction.  The dispute between the parties has been resolved."  The following disclosures, which are specific exceptions to this confidentiality provision, are permitted in the following limited circumstances: (i) such disclosures as are reasonably necessary for tax reporting purposes and as reasonably necessary to obtain legal, tax, or accounting advice or services; (ii) disclosure to the extent necessary in any legal proceeding involving enforcement of this Agreement; or (iii) disclosure which may be compelled pursuant to an order of a court of competent jurisdiction.  If

practicable, the party to be compelled to disclose pursuant to this section shall use its reasonable best efforts to provide the other party notice of such pending require disclosure, in order to permit the other party to object to disclosure.

C.  Apart from the Retraction and Apology Letters as set forth in this release, the parties agree:

i.  The parties must refrain from any and all contact, in any form, with or about each other.

ii.  [Plaintiff] represents and warrants that she shall not in the future make any disparaging, hostile, critical[,] or accusing remarks, statements[,] or comments regarding [Defendants] or any of Zachary Watson's family members, business associates, or social friends to any other person or entity.  [Plaintiff] agrees to make no statement, directly or indirectly, oral or in writing, that would cause or tend to cause [Defendants] embarrassment, humiliation, or to cause the recipient to question the business condition, integrity, confidence[,] or good character of any of the entities or persons set forth above.

iii.  The [Plaintiff] must refrain from directly or indirectly making, or authorizing any other contact or acquaintance, to make any public online post concerning or pertaining to [Defendants] in any way.

iv.  The [Plaintiff] must refrain from using [Defendants] or any member of Zachary Watson's family's images, names[,] or likeness in any online post, form, or any public venue.

v.  The [Defendants] shall refrain from any and all contact including any disparaging remarks in any form, with or about Ms. Foster, including but not limited to Twitter accounts operated by the [Plaintiff], Facebook, You-tube, and third-party test numbers.

[The] Parties agree that if any party is found by the Court and/or jury that they [sic] violated any terms of this paragraph, at any time, they will be liable to pay liquidated damages in the amount of Ten Thousand Dollars and Zero Cents ($10,000.00) per violation plus any attorney's fees and costs paid in protecting the rights and remedies of the aggrieved party.

Set. Agreement, p. 3-5.

Following the execution of the Settlement Agreement, Plaintiff posted the following on her

Facebook Account:

On June 19th and June 20, 2020, I made a series of statements about Zachary Watson on Facebook.

4

I formally retract my statements I made on those days about Zachary Watson.  I was not sexually assaulted or sexually harassed by Zachary Watson.

I sincerely apologize to Zachary Watson for making these statement.  I'm sorry for the damage and the emotional distress suffered by him, his family, and his associates.

Br. in Supp., Ex. B, p. 3; Def. Ex. 2 Part 2, p. 4.  This retraction was shared on Mr. Watson's

Facebook page.  Br. in Opp. 3.

Following Plaintiff publishing the above post, Mr. Watson, posted the following on his

Facebook page:



**Zack Watson**
16h · 🌐                                            •••

As a father I instill values and ethics in my kids, the most important, being the value of honesty and the consequences of a lie.  If I focus only on monetary value, a lie cost me over $70,000.  However, if we consider the consequences, my wife left with my kids. I lost friends. My wife and my kids were the targets of death threats. I received numerous threats against my life and violence against my studio, I lost someone I loved like a brother because the internet went after my friends by calling their jobs numerous times trying to get them fired. While I was forced to carry a brave face forward as I was bombarded by online bullying incessantly. Losing my wife, my kids, and my friends, I almost took my own life. I haven't seen my oldest son in over a year. I have sought psychiatric help.  I have been diagnosed with PTSD and Anxiety. My art and my life's work was almost taken from me. I was scared to go to my studio from threats from those online. My business lost jewelry companies and customers. I faced embarrassment anytime I ventured into public because, I was called an abuser, a predator, a monster and a rapist, instead of being known as the father, business owner, and philanthropist.  People made false social media accounts and leave false reviews against my business. People made fake accounts and bully my wife and family, forcing them into them deleting social media. The cost of a lie has been more than I can accurately describe in words.

We have had many stand by my side through this and for those people I am eternally grateful. I remained silent and worked diligently within the constraints of the law to obtain justice. I have lost countless nights of sleep. I have cried. I hurt, even today. I am irreparably damaged. I still went to work. I still served our clients. I stand today, a man that wishes no malice to anyone involved, yet hope this can be a chance to learn the consequences of what these lies can do. I am fortunate to yet draw breath. I chose to use this as a tool to advocate for victims of genuine abuse and those who have been victims of false allegations. Let us pause to think of what caused the Tulsa race massacre where a black man was falsely accused of sexual assault which lead to more than 800 people admitted to hospitals, and as many as 6,000 Black residents interned in large facilities, many of them for several days. The Oklahoma Bureau of Vital Statistics officially recorded 36 dead. It was later found out that his egregious crime was stumbling into a lady on an elevator and stepping on her shoe. A lynch mob was going to kill this man over a false claim. With every false claim, real victims are silenced, afraid no one will believe them. This is unacceptable. I as a child was a victim of abuse which I have never publicly talked about, yet the claim made against me had me face the pain of again.

The cost of a lie can be more than we ever imagine. Personally and professionally we will always stand to advocate help for victims. It's my personal belief every voice should be heard, evidence sought, and criminals be it those who hurt through abuse or those who make false claims see justice. I pray every day that we can recover as much of the humanity that was stolen from me as possible. We pray that we can help others avoid abuse of any kind. With this post I lay this incident to rest. I ask that no one bring this up to use as a cudgel against the parties involved and only hope to move forward, all parties, with a new value in protecting those who are hurt by being honest, vigilant, and expressing integrity first. We all make mistakes. Our mistakes should not define us, yet offer the opportunity to learn and do better. Through therapy, I have learned to be strong, to be kind, to be gentle and to forgive. Humbly, I stand before you, the people, to move forward in a positive way. I have also been continuing the charity work we do, but will be including more action to help victims of sexual abuse as well as extreme mental abuse. In a world full of so much hate let us not perpetuate it but instead look at this negative time with love, leading to a more promising future in our industry as well as in our day-to-day life. Integrity will continue to be first and foremost as has always been in my perspective. It took courage to right the wrong that was done all that time ago and I am thankful that is the outcome that could be reached. Thank you for reading, and god bless.

Br. in Supp., Ex. 2; Def. Ex. 2 Part 2, pp. 1-2.

Outside of the above post from Mr. Watson, Mr. Watson additionally responded to and liked comments from other individuals on Facebook, which Plaintiff alleges violated the terms of the Settlement Agreement.  Mot. 4-6.  The parties are in agreement that Mr. Watson responded to and liked comments on Facebook, and have included these comments as exhibits, however, neither party has made it clear what post the comments and likes were posted under or provided a general time frame as to when the comments and likes were posted.   Additionally, while Plaintiff has included general allegations as to what these comments and likes say, *see* Mot. 8-9, Plaintiff has not specifically identified what specific comments she alleges violate the Settlement Agreement.

Following the publishing of Mr. Watson's Facebook post, Plaintiff deleted her retraction and apology from Facebook.  Br. in Supp. 11; Br. in Opp. 3.  Additionally, following Mr. Watson's Facebook post, Plaintiff posted on the "Piercing Babes" Facebook page.  Reply 3; Br. in Opp. 3.  Defendant alleges that her post stated that Plaintiff had only signed the Settlement Agreement because she did not have enough money to fight the Underlying Lawsuit.  Br. in Opp. 3-4.

## II.    Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light

most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

"The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact." *Bavone v. Primal Vantage Co., Inc.*, No. 2:21cv1260, 2024 WL 756815, at *1 (W.D. Pa. Feb. 21, 2024). When the moving party carries their burden, the summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further:

> A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. *See id.* If the non-moving party does not respond in this manner, the court, when appropriate, shall grant summary judgment. Fed.R.Civ.P. 56(e).

*Mahaven v. Pulaski Twp.*, 139 F. Supp. 2d 663, 664–65 (W.D. Pa. 2001), *aff'd*, 45 F. App'x 155 (3d Cir. 2002); *see also Bavone*, 2024 WL 756815, at *1 ("Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.").

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment.  *Liberty Lobby*, 477 U.S. at 248.

## III.   Discussion

Plaintiff has moved for summary judgment arguing that there is no genuine dispute of material facts that Defendants breached the confidentiality and non-disparagement clauses of the Settlement Agreement.  Additionally, Plaintiff has moved for summary judgment on Defendants' counterclaims arguing that there is no genuine dispute of material fact that she did not breach the Settlement Agreement.

To state a claim for breach of contract under Pennsylvania law, the plaintiff must plead the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages.  *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006).

### A.  Existence of a Contract

Here, Defendants raise no arguments that there was not a valid contract.  However, Defendants do argue that Plaintiff revoked her consideration under the Settlement Agreement.  Br. in Opp. 7-8.  Specifically, Defendants argue that, as part of the consideration for the contract, Plaintiff was required to post her retraction on Facebook.  *Id.*  And, that because Plaintiff deleted her retraction and apology from Facebook, there was no consideration for the contract.  *Id.*

However, importantly, both parties are in agreement that Plaintiff did not delete her retraction and apology until after Mr. Watson's post on Facebook.  Br. in Supp. 11; Br. in Opp. 3. Additionally, because Plaintiff alleges that Defendants breached the Settlement Agreement at the

time Mr. Watson posted on Facebook, the Court must decide if there was a valid, enforceable contract prior to Mr. Watson's Facebook post.  The Court finds that there was.

Pennsylvania law is clear that a settlement agreement is enforceable "if all its material terms have been agreed upon by the parties."  *Pennsbury Village Associates, LLC v. Aaron McIntyre*, 608 Pa. 309, 322 (2011) (citing *Century Inn, Inc. v. Century Inn Realty*, 358 Pa. Super. 53, 58 (1986)).  Therefore, "[a] settlement agreement will not be set aside absent a clear showing of fraud, duress, or mutual mistake."  *Id.* (citing *Rago v. Nace*, 313 Pa. Super. 575, 578 (1983)).  Defendants do not contend that they were subject to fraud, duress, or mutual mistake at the time they entered into the Settlement Agreement.  Additionally, both parties bring claims for breach of contract arising out of the Settlement Agreement which further supports the finding of a valid contract.  Therefore, the Settlement Agreement is a valid contract to which both parties were bound, and it is governed by the principles of contract law.  *Id.*

**B.  Defendants' Breach of the Settlement Agreement**

Plaintiff alleges that Defendants breached the confidentiality and non-disparagement clauses of the Settlement Agreement.  Specifically, Plaintiff alleges that Defendants breached these clauses with Mr. Watson's Facebook post and by Mr. Watson commenting on and liking other Facebook users' comments.  Br. in Supp. 3.  Defendants argue that the Facebook post at issue did not breach the confidentiality and non-disparagement clauses of the Settlement Agreement.  Br. in Opp. 5-10.  Additionally, Defendants argue that Plaintiff has failed to identify which comments and likes are at issue for purposes of determining whether Defendants breached the agreement.  *Id.* Lastly, Defendants argue that even if Mr. Watson breached the Settlement Agreement, Plaintiff has failed to present any evidence that Z. Watson Enterprises is liable for Mr. Watson's breach. *Id.*

### a.  Mr. Watson's Facebook Post

The Court will begin with determining whether Mr. Watson's Facebook post breached the Settlement Agreement.  The parties disagree on whether the Facebook post contained disparaging and confidential remarks.  Therefore, the Court's primary task at hand is contract interpretation to determine the intent of the parties under the confidentiality and non-disparagement clauses.

Under Pennsylvania law, the touchstone of contract interpretation is ascertaining "the intent of the contracting parties, as objectively manifested by them." *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994) (citing *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980)).  "If the parties' 'intent can be cleanly extracted from the clear and unambiguous words that the parties have used, it is equally conventional wisdom that they are held to those words contained in the contract.'" *Allied Erecting & Dismantling, Co. v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001) (quoting *Compass Tech., Inc. v. Tseng Labs., Inc.*, 71 F.3d 1125, 1131 (3d Cir. 1995)).

The process of interpreting a contract under Pennsylvania law requires a court to make a preliminary inquiry into whether the contract is facially clear and unambiguous.  *See Ready Food Prods., Inc. v. Great N. Ins. Co.*, 612 A.2d 1385, 1387 (Pa. Super. 1992) ("The threshold determination of whether a writing is 'ambiguous' necessarily lies with the court.").  "The language of a contract is unambiguous if [the court] can determine its meaning 'without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends.'" *Profit Wize Marketing v. Wiest*, 812 A.2d 1270, 1274 (Pa. Super. 2002) (quoting *Baney v. Eoute*, 784 A.2d 132, 136 (Pa. Super. 2001)).  "When terms in a contract are not defined, [the court] must construe the words in accordance with their natural, plain, and ordinary meaning." *Cordero v. Potomac Ins. Co. of Illinois,* 794 A.2d 897, 900 (Pa. Super. 2002).

If, however, a contract provision is found to be ambiguous in that it is susceptible to two reasonable alternative interpretations, "the interpretation of the contract is left to the factfinder ... to resolve the ambiguity in light of extrinsic evidence." *Hullett,* 38 F.3d at 111 (applying Pennsylvania law).

### i.  The Non-Disparagement Clause

The Court begins with interpreting the non-disparagement clause in Section 5(C) of the Settlement Agreement.  In the Settlement Agreement, Defendants agreed to "refrain from any and all contact including any disparaging remarks, in any forum, with or about Ms. Foster."  Sett. Agreement, p. 5.

The Court finds that the language in the non-disparagement clause is unambiguous and, therefore, the Court is bound to define the words in the clause in accordance with their ordinary meaning.  The non-disparagement clause clearly provides that Defendants may not make disparaging remarks about Plaintiff.  The *Oxford English Dictionary* defines "disparaging" as "that disparages; that speaks of or treats slightly, that brings reproach or discredit." *Disparaging*, *Oxford English Dictionary* (online ed.), http://oed.com/dictionary/disparaging_adj (last visited July 30, 2024).  It defines "disparage" as "to speak of or treat slightingly; to treat as something lower than it is; to undervalue; to vilify." *Disparage*, *Oxford English Dictionary* (online ed.), http://oed.com/dictionary/disparage_v (last visited July 30, 2024).

Similarly, the *Merriam-Webster Dictionary* defined "disparaging" as "meant to belittle the value or importance of someone or something: serving or intended to disparage someone or something." *Disparging*, *Merriam-Webster Dictionary* (online ed.), https://www.merriam-webser.com/dictionary/disparaging (last visited July 30, 2024).  It defined "disparage" as (1) "to belittle the importance or value of (someone or something): to speak slightingly about (someone

or something)" or (2) "to lower (someone or something) in rank or reputation." Disparage, Marriam-Webster Dictionary (online ed.), https://www.merriam-webster.com/dictionary/disparage (last visited July 30, 2024).

Additionally, the *Merriam-Webster Dictionary* defines "about" as (1) "with regard to: concerning[;]" (2) "concerned with[;]" and (3) "fundamentally concerned with or directed toward." *About*, *Marriam-Webster Dictionary* (online ed.), https://merriam-webster.com/dictionary/about (last visited July 30, 2024).

Turning to the challenged Facebook post, the Court finds that it is disparaging under the ordinary meaning of the term. The post references the monetary, personal, and professional harm Mr. Watson experienced based on the "consequences of a lie." It additionally comments on Mr. Watson's personal struggles to obtain justice and right the wrong. Lastly, the post speaks to the consequences of lies in general and the need to support victims, whether victims of abuse or those who make false claims. Although the post does not mention Plaintiff by name, it references the Underlying Lawsuit, by speaking to righting a wrong and obtaining justice, and references false claims made against Mr. Watson. Additionally, the post was shared shortly after Plaintiff posted her retraction and apology on Facebook. In light of these facts, the Court finds that Mr. Watson's Facebook post breached the non-disparagement clause in the Settlement Agreement. *See Weiser v. Babik*, 2023 WL 6534185 (Pa. Super. Oct. 6, 2023) (finding that the appellee violated a non-disparagement clause when he made disparaging posts on Facebook, even when the posts did not directly name the appellant).

The question then becomes whether the breach of the non-disparagement clause was material or not. Generally, under Pennsylvania law,

> If a breach constitutes a material failure to perform, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached

a contract may not insist upon performance of the contract by the non-breaching party. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 559 Pa. 546, 962 A.2d 639, 648 (2009). Conversely, a party might breach the contract but still substantially perform its obligations under the agreement. *Cimina v. Bromich*, 517 Pa. 378, 537 A.2d 1355, 1358 (1988). In that case, the breach is deemed nonmaterial and the contract remains in effect. *Id.* The breaching party retains the right to enforce the contract and demand performance; the nonbreaching party has no right to suspend performance. [*Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 468 (Pa. Super. 2003)].

*McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. 2013).

For determining whether a breach was material or not, the Eastern District of Pennsylvania provides the following:

Pennsylvania precedent reflects that the materiality of a breach is generally an issue of fact to be decided by a jury. *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.,* 40 A.3d 1261, 1272 (Pa. Super. 2012). Nevertheless, Pennsylvania appellate courts have affirmed lower courts' findings of materiality as a matter of law where the breach goes directly to the essence of the contract. *See e.g.*, *Manning v. Kelly*, 2015 WL 9464459, at *13 (Pa. Super. 2015) (affirming the trial court's decision that "the breach of the [agreement] was material as a matter of law" because the "essential purpose of the [agreement] was … effectively rendered … a nullity."); *see also Oak Ridge Const. Co. v. Tolley*, 351 Pa. Super. 32, 504 A.2d 1343, 1348–49 (1985) ("Under these circumstances, we find that [the plaintiff's] breach constituted a material failure of performance thereby discharging the [defendants] from all liability under the contract.").

*American Diabetes Association v. Friskney Family Trust*, 177 F. Supp. 3d 855, 867 (E.D. Pa. 2016). Pennsylvania Courts consider the following five factors to determine whether a breach is material:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Aljawad v. Majeed*, 614 Fed. App'x 63, 65-66 (3d Cir. 2015) (citing *Widmer Eng'g, Inc. v. Dufalla,* 837 A.2d 459, 467 (Pa. Super. 2003)).

Here, the Court presumes that the parties are discussing materiality when Plaintiff argues that, if she breached the Settlement Agreement, she is not liable because her duties under the Settlement Agreement were discharged following Defendants' breach. *See* Br. in Supp. 11. While Defendants argue that Plaintiff did breach the Settlement Agreement following Mr. Watson's Facebook post. *See* Br. in Opp. 12. Additionally, the parties point to the language of the Settlement Agreement itself. Plaintiff argues that the confidentiality clause specifically states that it "is a material term" of the Settlement Agreement, *see* Br. in Supp. 1, 8, while Defendants argue that the confidentiality clause contains language that it was to remain in effect indefinitely, *see* Br. in Opp. 12. While both parties acknowledge that this language only appears in the confidentiality clause, they both present arguments that suggest that the non-disparagement clause is also a material term of the Settlement Agreement and was to remain in effect indefinitely. *See* Br. in Supp. 1 ("the agreement expressly states that these clauses were a "material" part of the agreement"; Br. in Opp. 12 ("Plaintiff's obligation to remain silent w[as] to remain in effect indefinitely and could not be negated by any alleged action of breach by Watson").

Section 5 of the Settlement Agreement contains the Confidentiality and Non-Disparagement clauses. As stated by the parties, Sections 5(A) and 5(B) contain the confidentiality clause while Section 5(C) contains the non-disparagement clause. Section 5(A) contains language that the parties' agreement to keep information confidential "is a material term of this agreement"

15

and that the parties' obligation to keep information confidential "shall survive the consummation of this agreement and remain in effect indefinitely."  Sett. Agreement, p. 3.

The Court finds that Section 5(A) is unambiguous because it clearly sets forth that, while it is a material part of the contract, the confidentiality clause was to remain in effect indefinitely. This language makes clear to the Court that a breach of Section 5(A) would not render Plaintiff's duties void under the Settlement Agreement.

Additionally, the Court finds that the language of Section 5 in its entirety makes clear that all of Section 5 was to remain in effect indefinitely, and not just Section 5(A).  The confidentiality and non-disparagement clauses both protect against similar, overlapping harms, that is both clauses protect the parties from instances of the other party speaking about them or the Underlying Lawsuit in any manner, including a disparaging manner.  Additionally, Section 5 provides for liquidated damages for any breach of either the confidentiality clause or non-disparagement clause further implying that Section 5 is to be read together.  While the Court acknowledges that, on its face, the non-disparagement clause allows for an alternative reading, the Court must look to the Settlement Agreement in its entirety when determining whether the language is ambiguous.  Here, because of the overlap in protections between the confidentiality clause and the non-disparagement clause, the clear language that the obligation shall remain in effect indefinitely, and the inclusion of a liquidated damages clause, the Court finds that the only reasonable interpretation is that the parties meant for all of Section 5 to remain in effect indefinitely regardless of a breach.

Therefore, the Court finds that while Mr. Watson breached the non-disparagement clause, his breach did not void the Settlement Agreement.  Therefore, each party remained bound by the Settlement Agreement moving forward.

Despite a finding that Mr. Watson breached the Settlement Agreement, the Court cannot find, at this time, that Z. Watson Piercing is liable for a breach by Mr. Watson.  Plaintiff has presented no evidence or argument as to why Z. Watson Piercing is liable for the actions of Mr. Watson and therefore, there remain questions of fact on this point.

For the reasons stated above, the Court finds that Mr. Watson breached the non-disparagement clause with his Facebook post and Plaintiff's Motion for Summary Judgment on this issue is granted.  However, Plaintiff's Motion for Summary Judgment is denied as to a finding that Z. Watson Enterprises is liable for Mr. Watson's breach.  Additionally, the Court finds that Mr. Watson's breach of the non-disparagement clause did not void the Settlement Agreement.

### ii.   The Confidentiality Clause

The Court now turns to whether Mr. Watson's Facebook post violated the confidentiality clause.  To begin, the Court finds that, in its entirety, the confidentiality clause is unambiguous. The parties clearly agreed to not disclose, reveal, publish, disseminate, or discuss, directly or indirectly, the terms of the Settlement Agreement or any knowledge of information they have about each other, including of the events giving rise to the Underlying Litigation, outside of limited exceptions.  Set. Agreement, p. 3-4.  Additionally, when asked about the Underlying Litigation, the parties were to only state that "There has been a retraction.  The dispute between the parties has been resolved."  *Id.* at 4.

Turning to Mr. Watson's Facebook post, the Court finds that it breached the terms of the confidentiality clause.  Mr. Watson's post directly and indirectly made reference to the Settlement Agreement, Underlying Lawsuit, and Plaintiff as discussed above.  Additionally, for the reasons discussed above, the Court finds that Mr. Watson's breach of the confidentiality clause did not void the Settlement Agreement.

17

For these reasons, the Court finds that Mr. Watson breached the confidentiality clause with his Facebook post and Plaintiff's Motion for Summary Judgment on this issue is granted. However, Plaintiff's Motion for Summary Judgment is denied as to a finding that Z. Watson Enterprises is liable for Mr. Watson's breach.  Additionally, the Court finds that Mr. Watson's breach of the confidentiality clause did not void the Settlement Agreement.

### b.   Mr. Watson's Facebook Comments and Likes

Next, the Court must decide whether Plaintiff has met her burden of establishing there is no dispute of material fact that Defendants breached the Settlement Agreement based on Mr. Watson's Facebook comments and likes.  The Court finds that Plaintiff has not.

The Court agrees with Defendants that Plaintiff has not provided the Court with any information as to what comments and likes she alleges violated the Settlement Agreement nor has Plaintiff offered any substantive analysis as to how these comments and likes violated the Settlement Agreement.   In her Motion for Summary Judgment, Plaintiff gives conflicting information as to how many of Mr. Watson's Facebook comments and likes breached the Settlement Agreement.  Br. in Supp. 9 ("Plaintiff gives twenty-seven specific examples"); Br. in Supp 12 ("between fifteen and nineteen separate violations").

Additionally, there are questions of fact as to what post these comments and likes were posted under and what time frame these comments and likes were posted.  While the Court has reviewed Plaintiff's exhibits, including Exhibit A which contains a string of Facebook comments, some from Mr. Watson and some from other individuals, Plaintiff fails to adequately "connect the dots" to develop a clear understanding of Plaintiff's basis for summary judgment.

Therefore, Plaintiff's Motion for Summary Judgment is denied as to the issue of whether Mr. Watson's Facebook comments and likes violated the Settlement Agreement.

18

### C. Plaintiff's Breach of the Settlement Agreement

The Court now turns to Defendants' counterclaims and whether Plaintiff has met her burden of establishing that she is entitled to judgment as a matter of law on the counterclaims.  As stated above, Defendants allege multiple breaches of the Settlement Agreement by Plaintiff, including: (1) the failure to provide a handwritten retraction and apology letter pursuant to Section 1(B) of the Settlement Agreement; (2) the removal of her retraction and apology from Facebook; (3) and her statements to a group called "the Piercing Babes" that she only signed the agreement because she did not have enough money to fight.

In support of her Motion for Summary Judgment, Plaintiff argues that she did not breach the Settlement Agreement while at the same time arguing that, even if she did breach the Settlement Agreement, Defendants breached it first and, therefore, she was not bound to continue to perform her duties under the Settlement Agreement. Br. in Supp. 11.

Despite Plaintiff's arguments to the contrary, the Court has found that Mr. Watson's breach of the non-disparagement and confidentiality clauses did not void Plaintiff's duties under the Settlement Agreement.  The Settlement Agreement, read in its entirety, is unambiguous and makes clear that the parties intended for the Settlement Agreement to remain in effect indefinitely despite a breach of the non-disparagement and confidentiality clauses.  Therefore, Plaintiff's arguments that she was relieved of her obligations and could not have breached the Settlement Agreement following Mr. Watson's breach are without merit.

The Court now turns to Defendants' alleged breaches of the Settlement Agreement.  As to the first alleged breach, Defendants now state in their Response that "[u]nder the record evidence, there is no dispute that" Plaintiff provided the handwritten letter.  Therefore, the Court finds that Plaintiff is entitled to summary judgment on this portion of Defendants' counterclaim.

As to the second alleged breach, Defendants argue that Plaintiff's removal of her retraction and apology from Facebook was a breach of the Settlement Agreement. Br. in Opp. 6-8. Plaintiff argues that she did not breach the Settlement Agreement because the Settlement Agreement did not specify a time frame for the posting of the retraction and apology. Reply 4.

The Settlement Agreement states that:

> [Plaintiff] agrees to post a formal retraction and apology on Facebook and all other social media platforms on which her June 19, 2020 and June 20, 2020 posts, which are the subject of [the Underlying Lawsuit], were shared. She shall post the retraction and apology on her personal Facebook account and it shall be shared on Plaintiff's Facebook page. The Retraction and Apology is attached hereto as Exhibit A. This Retraction and Apology shall be posted on both her page and story on her Facebook account. This retraction and apology shall also be posted as a comment to the original June 19, 2020 and June 20, 2020 posts. This shall happen within three (3) days after [Plaintiff] executes this agreement. [Defendants] may post or link this retraction on social media accounts. [Plaintiff] agrees to delete or take down all other social media posts regarding [Defendants].

Sett. Agreement, p. 1.

The Court finds that the Settlement Agreement is silent as to how long the retraction and apology were to remain on Facebook. Therefore, the Court may look to extrinsic evidence to determine the parties' intent with respect to the timeline for the posting of the retraction and apology. *See Kingsly Compression, Inc. v. Mountain V Oil & Gas, Inc.*, 745 F. Supp. 2d. 628, (W.D. Pa. 201) (under Pennsylvania law, the Court may look to extrinsic evidence to determine the parties' intent when the contract is silent on an issue). Here, the extrinsic evidence available from the present record does not provide any specific clarification, let alone certitude, as to what the parties' intent was with respect to how long the retraction and apology were to remain on Facebook. Therefore, there are questions of fact, and the Court will deny Plaintiff's Motion for Summary Judgment as to this portion of Defendants' counterclaim.

Lastly, as to Defendants' third alleged breach, Defendants argue that Plaintiff violated the Settlement Agreement by posting to a group called "the Piercing Babes" following Mr. Watson's Facebook post.  Br in Opp. 3.  This post allegedly included statements that she only signed the Settlement Agreement because she did not have enough money to fight the Underlying Lawsuit. *Id.* at 3-4.  Defendants argue that Plaintiff then deleted her post to the Piercing Babes and did not preserve it leading to the spoliation of evidence.  *Id.* at 4.  Plaintiff argues that she did not delete anything on the Piercing Babes Facebook page and that whatever she did post on the page is irrelevant because it occurred after Mr. Watson made his Facebook post.  Reply 3.

The Court finds that summary judgment is not appropriate as to this portion of Defendants' counterclaims.  While Plaintiff appears to admit that she made a post on the Piercing Babes Facebook Page, no party has presented evidence as to what the alleged post on the Piercing Babes Facebook page said.  Therefore, the Court can make no determination as to whether the post violated the terms of the Settlement Agreement and Plaintiff is not entitled to summary judgment on this portion of Defendants' counterclaims.

## IV.    Conclusion

For the reasons discussed above, the Court will grant, in part, and deny, in part, Plaintiff's Motion for Summary Judgment.  The Court grants Plaintiff's Motion, in part, finding that Defendant, Zachary Watson's, Facebook post breached the confidentiality and non-disparagement clauses of the Settlement Agreement.  The Court also grants Plaintiff's Motion as to Defendants' Counterclaim that Plaintiff breached the Settlement Agreement by failing to provide a handwritten letter of apology.  The remainder of Plaintiff's Motion is denied.  An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: August 9, 2024

cc: All counsel of record